**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **SHARON GRAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:14-CV-225 (MTT)** |
| | ) | |
| **TRI-COUNTY ELECTRIC MEMBERSHIP CORPORATION d/b/a TRI-COUNTY EMC,** | ) ) ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff Sharon Gray, who is African-American, alleges she was retaliated against and ultimately fired by Defendant Tri-County Electric Membership Corporation d/b/a Tri-County EMC ("Tri-County") because of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, and 42 U.S.C. § 1981.  (Doc. 1, ¶¶ 17-32).  She also asserts state-law claims for intentional infliction of emotional distress and negligent retention and supervision.  (*Id*., ¶¶ 33-41).  Tri-County has moved for summary judgment.  (Doc. 18).  For the following reasons, the motion is **GRANTED in part and DENIED in part**.

### I. BACKGROUND[1]

---

[1] Gray denied 52 of the 247 material facts Tri-County submitted to support its motion for summary judgment.  (Doc. 30-4).  In its reply brief, Tri-County objects to Gray's responses on a number of grounds: she did not provide citations to the record that specifically controvert the material facts she denies as required by Local Rule 56; she disputes facts about which she has no knowledge, speculating about what happened instead; and she submitted a declaration with her reply brief to contradict several of the material facts, even though some of the statements are not based on personal knowledge.  (Doc. 40 at 2-6).

As Tri-County points out, some of the facts Gray "denies" are not actually denials of the facts as listed in the statement–instead, she provides additional commentary and explanation about the facts.  (Doc. 30-4,

Tri-County is a cooperative business that provides electricity in Baldwin, Jones, and Putnam counties in Georgia.  (Doc. 30-4, ¶ 1).  It is owned by those it serves, and its customers are called "members."  (*Id.*, ¶¶ 1-2).  Dawn Haskins, who is Caucasian, is Tri-County's Senior Executive Vice President and Chief Financial Officer.  (*Id.*, ¶¶ 5-6).  The customer service department is one of her responsibilities.  (Doc. 27, ¶ 3).  Brenda Appling supervises the customer service department and reports directly to Haskins.  (Doc. 30-4, ¶¶ 45, 48, 50, 88).  Appling, who is African-American, was Gray's immediate supervisor in the customer service department.  (Docs. 20 at 77:3-7, 82:3, 89:14, 92:10-11; 30-4, ¶ 46).  Julie Edwards, who is Caucasian, is the Senior Customer Service Representative and performs many of the same duties as Appling.  (Doc. 30-4, ¶¶ 55-56, 65-66).

Gray began working at Tri-County in August of 2000 in the dispatch department.  (*Id.*, ¶ 18).  During her time in the dispatch department, she received positive

---

¶¶ 26, 28, 30, 45, 66, 91, 95, 106, 114, 121-22, 130, 147, 152, 161, 221).  For instance, several facts concern the contents of documents describing Gray's job performance.  Gray admits that these documents say what Tri-County says they do, and she provides additional information about the conduct that prompted the creation of these documents or information about what happened when she was presented with these documents.  (Doc. 30-4, ¶¶ 126, 128, 132, 136).  In these instances, the Court has considered the admitted portions of the facts as undisputed and has reviewed the evidence cited in the explanation.

Tri-County also complains that Gray is using her responses to their statement of material facts to contradict sworn deposition testimony.  (Doc. 40 at 4-6).  For instance, she contradicts her own deposition testimony that she did not know about the disciplinary history of other employees when she denied two statements of material fact.  (Docs. 20 at 281:15-20; 30-4, ¶¶ 164, 168).  The Court relies on the deposition testimony.  *Cf. Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984) ("[A] district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation.").

The Court has also disregarded any speculation offered by Gray in response to Tri-County's statement of facts.  *See Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir.2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (internal quotation marks omitted)).  For instance, Gray can only speculate about what Haskins and Appling discussed if she was not present for those conversations.  (Doc. 30-4, ¶¶ 9-10, 206).

performance appraisals, usually indicating "competent" performance.[2]  (*Id.*, ¶¶ 34, 37-38, 40-42).  In October of 2010, Gray transferred to Tri-County's customer service department, accepting a job as a customer service representative ("CSR").  (*Id.*, ¶ 43).

CSR responsibilities include taking telephone calls from members, making notes on members' accounts regarding those calls, addressing member questions and concerns, taking applications for service, and taking down work orders.  (*Id.*, ¶ 54).  CSRs may also make an "arrangement" for a member, which is an agreement allowing a member to extend the deadline for payment of a bill and preventing the interruption of electrical service.  (*Id.*, ¶ 81).  CSRs are required to make notes on member accounts after any interaction with members.  (Docs. 32 at 49:22-50:3; 30-4, ¶ 90).

When questions or problems arise in the customer service department, Appling speaks to individual employees about the problem and/or sends an email addressing the issue.  (Doc. 30-4, ¶ 89).  Haskins also periodically sends emails to employees in the customer service department about problems that have come to her attention or with reminders about policy and procedure.  (*Id.*, ¶¶ 91-93, 95, 97, 99-101, 103, 141, 178).   If Appling has a "counseling session" with an employee, she may draft a memorandum describing it for the employee file.  (*Id.* at ¶ 121).

## A.  Disciplinary History

During Gray's time in the customer service department, she was disciplined several times.  She had "verbal counseling sessions" with Appling for "chattering."  (*Id.*,

---

[2] Tri-County uses a scale of 1-5 to rate its employees in year-end performance appraisals.  1 is "poor," 2 is "marginal," 2.5 is "average," 3 is "competent," 4 is "commendable," and 5 is "exceptional."  (Doc. 21 at 82).  A ranking is assigned to each of seven categories: job knowledge / job skills; productivity; dependability; cooperation; safety / work environment; planning, scheduling, organization; and problem solving.  (*Id.* at 83).

¶ 120).  Disciplinary memoranda were also sometimes placed in her personnel file.[3]

The first is dated August 9, 2011,[4] and it states that Appling and Gray discussed issues

that included "constant chattering" and changes Gray should make in the way she took

information from members during calls.  (Docs. 22 at 78; 30-4, ¶ 123).  Around this time,

Gray sent an email to Haskins and Appling claiming that not all CSRs were being

disciplined for chatting.  (Doc. 20 at 152:20-153:1).  This was one example of Gray's

belief that other CSRs were "not being held accountable for the things she was," which

she reported to Appling.  (Docs. 30-4, ¶ 104; 32 at 50:18-19, 23-51:3).  Appling testified

that she "assured [Gray] … that was not the case," although she was not permitted to

explain that this was based on her knowledge of the disciplinary history of other

employees.  (Doc. 32 at 50:19-20).  Gray also told Appling she thought Haskins was

"picking on her."  (Docs. 30-4, ¶ 107; 32 at 52:12).

Gray's year-end performance appraisal for 2011, her first from the customer

service department, was issued by Appling, and Gray received a performance rating of

2.83.  (Doc. 30-4, ¶ 125).  While the assessment is positive overall, it notes that Gray

needs to improve on the way she handles member calls to reduce mistakes and that

she should spend less time talking and socializing.  (Doc. 22 at 79-80).

Appling placed the next disciplinary memorandum in Gray's personnel file about

a year after the last one, on August 21, 2012.  (Doc. 30-4, ¶ 126).  This was the first of

several documents from the last half of 2012 that describe Gray's failure to follow

---

[3] These memoranda will be discussed in detail below.

[4] Gray disputes that this memorandum was in her file on August 9, 2011 because Haskins told her that
nothing was in her personnel file at some point after August 9, 2011.  (Doc. 30-4, ¶ 123).

procedures in her interactions with members.[5]  Appling drafted two more disciplinary

memoranda in November 2012 and one in December.  (*Id.*, ¶¶ 128-29, 132).  Haskins

also emailed Gray in December about a customer service issue that arose from Gray's

errors.  (*Id.*, ¶ 131).  The problems described in these documents include failing to make

notes on the accounts, giving members incorrect information, incorrectly setting up new

service orders, failing to follow up on member requests, and failing to follow procedures

for taking payments from members.  (*Id.*, ¶¶ 126, 128-29, 132).  Some members'

electrical service was disconnected as a result of these errors.  (Doc. 22 at 81, 85).

One memorandum, which Gray signed, warned that future discipline for failing to follow

procedures could include termination.  (*Id.* at 85).  When Gray received it, she protested

that Sauls also made mistakes on this account and asked Appling if Sauls would also

be disciplined for her errors.  (Doc. 30-1, ¶ 16).  Appling said no.  (*Id.*).  Gray testified

that Appling told her she did not believe the discipline was warranted, and Gray only

signed the disciplinary memorandum because Appling told her it would be "in her best

interests" to do so.  (*Id.*).

   At some point in late 2012, Haskins and Appling began listening to some of

Gray's phone calls with members at random, which is how some of the problems with

her job performance were discovered.[6]  (Doc. 30-4, ¶ 134).  Others were discovered

when members complained or called back with problems that remained unresolved.

(Doc. 22 at 81, 84, 88).

---

[5] Gray disputes that these memoranda were warranted.  She does not believe she did anything
incorrectly, or, if she did, she says two other CSRs, Edwards and Angie Sauls, were making the same
mistakes without being disciplined.  (Doc. 30-4, ¶¶ 128-29, 132, 164, 166-68).  Gray testified, however,
that she has no knowledge of their disciplinary history.  (Docs. 20 at 281:15-20; 30-4, ¶¶ 165, 173).

[6] Tri-County records calls between members and CSRs, and they can be played back later in Haskins's
office.  (Doc. 32 at 90:24-91:6, 92:7-10).

Gray's year-end appraisal for 2012 was rated 2.0.  (Docs. 30-4, ¶ 136; 32 at 102:15-18).  When she protested that such a low rating was not warranted, Gray says Appling told her "you aren't doing anything wrong, they are just trying to make you quit. Don't quit."  (Doc. 30-1, ¶ 19).  Because Gray did not agree with this assessment of her job performance, she composed a rebuttal letter.  (Doc. 30-4, ¶ 137).  Although it says she was not on the "same page" as everyone else, the letter does not complain about discrimination.  (Docs. 22 at 92; 30-4, ¶ 139).  Instead, it explains that she did not understand that the way she was doing her job was incorrect, and she believes she has improved on the errors that were brought to her attention.  (Doc. 22 at 92).  Further, the appraisal only focuses on her errors, even though she does things correctly, too.  (*Id.*).

The incident that led to the termination of Gray's employment occurred about a month later.  The disciplinary memorandum states that on January 31, 2013, Gray spoke to a member who called intending to pay his bill, but she set up an arrangement for him instead,[7] and she told him "everything had been taken care of."  (Doc. 30-4, ¶ 142).  The member thought he paid the bill when he spoke to Gray.  (*Id.*).  However, his bill remained unpaid because she set up an arrangement for him instead of a payment, which led to his electrical service being disconnected.  (*Id.*).  When the member called back on February 4, he told Appling he had called customer service to pay his bill.  (Doc. 22 at 93).  Appling and Haskins listened to the phone call and concluded that Gray "did not follow through on anything the member stated."  (*Id.* at 94).

---

[7] Gray testified that the member asked for an arrangement.  (Doc. 20 at 199:3-4).

Gray was fired after this incident for "repeated failure to accurately perform basic job duties." (Doc. 30-4, ¶ 150-51). She was replaced by Christy Clay. [8] (*Id.*, ¶ 244). Clay, who is Caucasian, was the only applicant for the job. (*Id.*, ¶¶ 75, 247).

## B. Allegations of Racism

Gray alleges she made a number of allegations of racism at Tri-County, particularly on the part of Haskins. Tri-County disputes these allegations. For instance, sometime in mid-2012, Gray says she overheard Haskins say she was tired of "putting up with" either "uppity niggers" or "uppity black people."[9] (Docs. 30-1, ¶ 13; 30-4, ¶ 201). Gray says she immediately reported this comment to Appling, who told her "she would take care of it," although Appling says she does not remember this incident. (Docs. 20 at 228:16-17, 237:1-2; 30-4, ¶ 209 & n.23; 32 at 52:13-16, 68:10, 77:14-78:5). Haskins denies making this statement. (Doc. 35 at 26:10-12).

Gray also alleged Haskins told Appling she "had her tokens in place," so she did not have to worry about EEOC complaints. (Doc. 30-1, ¶ 10). Appling testified that she had never heard Haskins say this. (Doc. 32 at 64:20-65:2, 67:5-8). Haskins also denies making this statement. (Doc. 35 at 15:1-4).

Gray has further alleged that Appling told her "Haskins 'would brag about how many N's she has fired,'" that she has called African-American employees "monkeys," and that she has used the term "you people." (Doc. 30-4, ¶¶ 202, 205-06). These statements were not specifically addressed in either Haskins's or Appling's depositions,

---

[8] Gray has alleged that one of the reasons she was fired was that Clay wanted her job. (Doc. 30-4, ¶ 155, n.19).

[9] In her complaint to the EEOC, Gray wrote she overheard Haskins say "uppity black people" instead of "uppity niggers." (Docs. 22 at 112; 30-4, ¶ 201). In her complaint in this action, she alleges Haskins said "nigger." She explains that she wrote "black people" in her EEOC complaint because she found "nigger" so offensive. (Doc. 30-1, ¶ 13).

but Haskins denies making racist statements, and Appling testified that she does not recall anyone coming to her with complaints about racist statements by Haskins. (Docs. 30-4, ¶ 207; 32 at 78:19-79:1).

Gray also alleged that she overheard Edwards tell Clay "there are too many Black people around, but [Haskins] is going to take care of it. Give me a couple more days." (Doc. 30-4, ¶ 221). Edwards was not deposed, nor did she submit an affidavit. Appling testified only that the complaints she has received about Edwards were not on the basis of race; rather, other CSRs have complained that Edwards is treated differently because she does not have to follow the same rules they do, which was not so. (Doc. 32 at 114:8-19).

Gray further alleged that she often complained to Appling that Caucasian CSRs received preferential treatment, and ten or twelve of these complaints were specifically about preference on the basis of race. (Doc. 30-1, ¶ 6). She says Appling would acknowledge her complaints and respond by telling her "that's just the way it is" and to "grow a thick skin." (*Id.*, ¶ 8). Appling testified that Gray's complaints were not about racism but about the number of times she had been written up for inadequate job performance. (Doc. 32 at 105:13-18). Appling also testified that she does not remember Gray complaining to her that Haskins is a racist, and she has never seen Haskins treat an employee unfairly because of the employee's race. (*Id.* at 52:17-21, 53:3-5). Tri-County's CEO, Hill Bentley, testified that he has never heard complaints about unfair treatment by Haskins. (Docs. 30-4, ¶¶ 196, 237; 33 at 5:23-6:1).

## II.  DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## B. Title VII and 42 U.S.C. § 1981

Gray brings discrimination and retaliation claims under Title VII and 42 U.S.C § 1981. Title VII and section 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Svcs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Court will address Gray's Title VII claims with the understanding that the same analysis applies to her section 1981 claims.

### 1. Direct Evidence of Discrimination

Gray contends she has presented direct evidence of discrimination. Direct evidence of discrimination "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004). It is evidence that, "if believed, proves [the] existence of [a] fact in issue without interference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir. 1997). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998), does not constitute direct evidence of discrimination.

"'[T]he evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's [racial animus].' To qualify as direct evidence of discrimination, we require that a biased statement by a decision-maker be made

concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." *Williamson v. Adventist Health Sys/Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) (alterations in original) (quoting *Damon*, 196 F.3d at 1358-59).  Moreover, remarks that are isolated and "unrelated to the challenged employment decision" do not constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002).  "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).

The Eleventh Circuit addressed this most recently in *Quigg v. Thomas Cty. Sch. Dist.*, ___ F3d ___, 2016 WL 692177 (11th Cir. 2016).  In *Quigg*, a Title VII sex discrimination action, the plaintiff, who contended that members of a board of education improperly decided not to renew her contract as superintendent, argued that board members' statements constituted direct evidence that the board's decision was motivated by discriminatory intent. *Id.* at *9 & n.11.  Although the statements suggested some board members wanted a male presence in the superintendent's office, they all required some inference to support the conclusion that board members voted against the plaintiff because of her sex or gender. *Id.* at n.11.  Even when one board member said "'it is time we put a man in there,'" it was unclear whether he was referring to the plaintiff's position. *Id.*  While the statement clearly showed a desire for a male presence in the superintendent's office, that desire did not necessarily lead to the conclusion that the board wanted to remove the plaintiff from her position. *Id.*  Because linking the statement to the plaintiff's removal from her position required "some presumption," the statement did not constitute direct evidence. *Id.*

Here, Gray contends she has presented direct evidence of discrimination because there was "discriminatory animus" against African-Americans at Tri-County. (Doc. 30 at 4).[10]  To support this contention, she alleges that (1) she overheard Haskins say she was "tired of putting up with the uppity niggers," (2) Haskins told Appling "she had her 'tokens in place' so she wasn't worried if people went to the EEOC," (3) Haskins bragged about the number of African-Americans she had fired to Appling, (4) Haskins referred to African-Americans as "you people," (5) Haskins scolded Gray and another African-American CSR for "acting like monkeys," and (6) Gray overheard Edwards tell Clay on the telephone "that there were 'too many Black people around but [Haskins] is going to take care of it,' and that she 'needs a couple more days.'"  (*Id.* at 4-5).  Gray contends that these statements demonstrate an "attitude correlating with discrimination."  (*Id.* at 5 (citing *Wilson*, 376 F.3d at 1086)).

Gray misconstrues the standard for direct evidence. The proffered statements, even if true, are not direct evidence of discrimination because they require inference or presumption.[11]  Direct evidence consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Schoenfeld*, 168 F.3d at 1266 (internal quotation marks and citation omitted).  The statements Gray offers do not meet this strict standard.  Even if believed, Haskins's statements do not prove that Gray was fired on the basis of her race.  *See Wilson*, 376 F.3d at 1086 ("If the alleged statement suggests, but does not prove, a discriminatory

---

[10] The Court has cited the CM/ECF page number.

[11] A footnote in Gray's brief also does not prove direct discrimination–quite the opposite actually.  She says that she requested a meeting of all the CSRs, which "*could be construed* as stepping out of 'her place'" and that it "supports the *inference*" that Haskins was directing this remark at Gray.  (Doc. 30 at 4, n.1) (emphasis added).  As Gray admits that this request requires inference, it is obviously not direct evidence of discrimination.

motive, then it is circumstantial evidence.").  These are not the kind of blatant remarks considered direct evidence in this Circuit.  *Compare, e.g., Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir. 1995) ("[A] statement that members of a racial minority in general … are simply not competent enough to do a particular job would seem to be a classic example of direct evidence."); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923, 924 (11th Cir. 1990) (holding that a company decisionmaker's statement that "if it was his company he wouldn't hire any black people" was direct evidence of discrimination).

Moreover, none of the racist statements are temporally connected to Gray's termination or any alleged retaliatory action.  For example, Gray argues that Haskins's statement that she was "tired of putting up with uppity niggers" is her strongest direct evidence.  (Doc. 30 at 4).  However, the statement was allegedly made in mid-2012, and Gray lost her job the following February.  The fact that the remark and the adverse employment action occurred several months apart requires some inference that the two are related.  *See Williamson*, 372 F. App'x at 940 ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination."); *Bernstein v. Sephora, Div. of DFS Group L.P.*, 182 F. Supp. 2d 1214, 1218 (S.D. Fla. 2002) (noting in a failure to promote case that a "close nexus" between the employer's discriminatory remarks and the adverse employment action is necessary to constitute direct evidence).  Gray has presented no evidence that any of Haskins's alleged statements are sufficiently close in time or otherwise connected to her termination or any alleged retaliatory action.

Because Edwards was not the decisionmaker, her alleged remark is not direct evidence of discrimination. *Standard*, 161 F.3d at 1330 ("[R]emarks by non-decisionmakers … are not direct evidence of discrimination.").

Thus, the Court will consider these comments as circumstantial evidence of discrimination for the purposes of summary judgment.

### 2. *McDonnell Douglas* Framework

A Title VII plaintiff may prove her case circumstantially when there is no direct evidence of discrimination. The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation omitted).

### 3. Disparate treatment

To establish a prima facie case, Gray must show that: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position; (3) [she] suffered an adverse employment action; and (4) [she] was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Tri-County concedes that Gray has established her prima facie case of disparate treatment because she was replaced by someone outside her protected class.[12] (Doc. 18-1 at 6). Therefore, the burden of production shifts to Tri-County to articulate a legitimate, nondiscriminatory reason for the disparate treatment. The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for

---

[12] Gray has also presented evidence of a comparator, Sauls. (Doc. 30 at 6). However, Tri-County has conceded that Gray established her prima facie case, so the Court need not consider her comparator evidence at this point.

a good or bad reason without violating federal law.  [Federal courts] are not in the
business of adjudging whether employment decisions are prudent or fair.  Instead,
[their] sole concern is whether unlawful discriminatory animus motivates a challenged
employment decision." *Damon v. Fleming Supermarkets of Fla, Inc.*, 196 F.3d 1354,
1361 (11th Cir. 1999) (citations omitted).

Tri-County asserts that Gray's employment was terminated because she
repeatedly violated policies and procedures when she interacted with members.  (Docs.
18-1 at 7; 22 at 95).  As evidence, Tri-County points to several internal documents, such
as memoranda, emails, and reprimands that describe Gray's failure to follow
Tri-County's policies and procedures.  (Doc. 22 at 81, 83-91, 93-94).

First, in August 2012, after listening to Gray's telephone conversation with a
member, Appling prepared a memorandum detailing three problems she and Haskins
identified with the way Gray handled the call: Gray gave the member incorrect
information; she did not look up the service order in their system, where she would have
found the information the member needed; and she did not make notes on the
member's account.  (*Id.* at 81).  Finding this conduct "unacceptable," Appling instructed
Gray that she must make notes on member accounts and learn to use Tri-County's
policies and procedures correctly.  (*Id.*).

Next, on November 8, 2012, Haskins sent Appling an email saying that Gray "did
everything wrong" on an account.  (*Id.* at 83).  A few days later, Gray received and
signed a disciplinary memorandum entitled "Failure to Follow Procedures."  (*Id.* at
84-85).  This memorandum described several problems with the way a member's
request for new service was handled: Gray did not enter the service order when she

received the call as required; she allowed an old address to populate the mailing address field so the member did not receive a bill; she did not ask the member about a charitable project, Operation Roundup; and the member received a "yellow light," indicating a credit problem, but she was not charged a deposit.[13]  (Docs. 20 at 171:3-4; 22 at 84-85).  The errors resulted in the member's service being disconnected, Tri-County's resources being wasted because an employee had to be sent to the member's home twice, and putting Tri-County at risk of incurring bad debt.  (Doc. 22 at 85).  The memorandum notes that even though Gray has been a CSR for two years, her job performance is more like a new employee or trainee.  (*Id.*).  It warns that future errors may result in termination.  (*Id.*).

On November 16, Appling prepared another memorandum about Gray's continuing failure to follow procedure.  (*Id.* at 87).  Haskins and Appling listened to another of Gray's phone calls and identified three problems with the way she handled the call from a member who needed to reschedule service at his home: she did not document the phone call on the service order; she did a "cold transfer" to another employee at Tri-County without first checking to see if he was available to take the call; and she did not notify the dispatch department that this service may be rescheduled.  (*Id.*).  The member's problem remained unresolved until Appling and Haskins listened to the call and Appling followed up on his request to reschedule the maintenance.  (*Id.*).

---

[13] Gray testified that she believes Sauls should have been reprimanded for this incident, as well, because she is the person who should have charged the deposit when she finished the service order.  (Doc. 20 at 165:16-18,172:3-5).  When the member came in to the office, Sauls checked her identification and completed the service order Gray had started.  (*Id.* at 165:18-166:4).  Gray testified that the deposit should have been charged at that time rather than during her initial call with the member.  (*Id.* at 165:16-18, 166:2-4).

On December 6, Haskins discovered another customer service problem resulting from a call Gray took.  (*Id.* at 88).  A member called to tell Tri-County that he had mailed a check, and Gray "told him it was okay and [she] would take care of it."  (*Id.*).  However, Gray did not enter an arrangement for the member, and a technician was dispatched to disconnect the member's power as a result of her error.  (*Id.*).  Haskins also noticed that Gray did not make any notes on the account documenting the call.  (*Id.*).

On December 17, Appling prepared another memorandum about Gray's failure to follow procedures during a call.  (*Id.*).  Haskins and Appling heard two errors in the way that Gray took an e-check from a member: she did not tell the member about the convenience fees before taking the member's check information, as Haskins had instructed earlier that month; and she saved the member's check information on the account without asking permission.  (*Id.* at 89).  The memo states that Gray knows that Haskins and Appling are now listening to some of her calls "because of her low level proficiency and the extremely high number of errors."  (*Id.*).

Gray's year-end performance appraisal for 2012 was rated a 2.0.  (*Id.* at 90-91).  It notes that "she makes a lot of mistakes" due to talking and inattentiveness, her productivity is "extremely low," she distracts other employees in the work area, she does not enter information in the computer while on the phone with members as she should, she does not prioritize her duties appropriately, and, despite several counseling sessions, her supervisors have seen minimal improvement.[14]  (*Id.*).

---

[14] Gray did not agree that this was an accurate depiction of her job performance, and she wrote a rebuttal letter explaining that she did not realize she was doing her job incorrectly.  (Doc. 22 at 92).  She believes she improved on the errors that were brought to her attention.  (*Id.*).

Finally, on February 4, 2013, Appling drafted a memorandum describing the incident that led to Gray's dismissal.  (*Id.* at 93-94).  A member's electrical service had been disconnected for non-payment after he called and spoke to Gray about paying his bill.  (*Id.* at 94).  Haskins and Appling listened to the call and identified three errors: Gray placed the member on hold for 57 seconds; Gray did not properly verify the reason the member had called; and Gray set up an arrangement[15] instead of taking the member's payment over the phone, even though he had told her he wanted to pay his bill that day.  (*Id.* at 93-94).  He thought he paid the bill while they were on the phone.  Because Gray did not "follow through" with the request to pay his bill that day, his electricity was disconnected.  (*Id.*).  The memo notes that Gray's year-end performance evaluation had described the errors she had been making and that she had been counseled several times about these mistakes.  (*Id.* at 94).

Tri-County contends that these documents demonstrate poor job performance. (Doc. 18-7 at 7).  Poor job performance is a legitimate, nondiscriminatory reason for an adverse employment action.  *Damon*, 196 F.3d at 1361; *Brooks v. Hyundai Motor Mfg. Ala., LLC*, 2010 WL 3614168 (M.D. Ala.) ("An employer's honest belief (even if erroneous) that an employee violated a work rule constitutes a legitimate, nondiscriminatory reason for firing an employee."); *cf. Williamson*, 372 F. App'x at 938, 941 (holding that a critical error, which the plaintiff admitted making, provided a legitimate, nondiscriminatory reason for "effectively terminat[ing]" a temporary employee).

Because Tri-County has articulated a legitimate, non-discriminatory reason for terminating Gray's employment, the burden shifts back to Gray to show that

---

[15] Gray testified that he requested an arrangement.  (Doc. 20 at 199:3-4).

Tri-County's stated reason is in fact pretext for discrimination.  To demonstrate pretext, Gray may "produce sufficient evidence to allow a reasonable finder of fact to conclude that [Tri-County's] articulated reasons were not believable.  She could do this by pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation."  *Brooks v. Cty Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).

Gray testified that when the November 12 memorandum was presented to her, Appling told her that she did not believe the discipline was warranted, but Haskins had directed her to issue it.[16]  (Doc. 30-1, ¶ 16).  She also testified that when Appling gave her the year-end performance evaluation for 2012, Appling agreed that the evaluation was "excessively critical" and told her "you aren't doing anything wrong, they are just trying to make you quit.  Don't quit."  (Doc. 30-1, ¶ 19).  Essentially, Gray testified that Appling told her that the documents were pretextual when she gave them to Gray.

Gray does not make similar allegations about Appling's reaction to her protests of unfairness about the event that led to her discharge.  This time, she says Appling told her she handled the call incorrectly.  Gray contends that Appling told her she should have "assumed payment" from this member, and Appling would not listen to her explanation that the member did not give her the authority to take a payment from his

---

[16] Gray's declaration says the same regarding the November 16 memorandum.  (Doc. 30-1, ¶ 17).  However, in her deposition, she testified that she does not remember her conversation with Appling about this incident.  (Doc. 20 at 182:13-21).  Because this section of the affidavit contradicts her deposition testimony without explanation, the Court will disregard it.  *Van T. Junkins & Assoc., Inc.*, 736 F.2d at  657.  The testimony Gray uses to support this argument in her response brief is not about this incident; rather, the testimony is about a conversation Gray had with Appling "some months before" she was fired in which Appling told Gray she was not doing anything wrong, and Appling was "just trying to keep [her] job." (Doc. 20 at 237-38).  Nothing in this section of the deposition ties the conversation to the November 16 incident.

account.  (Docs. 20 at 201:24-202:2, 11-12; 30-1, ¶ 21).  Gray further contends that

Appling refused to listen to the recording of the call with her so they could hear whether

the member requested an arrangement or a payment.  (Doc. 30-1, ¶ 21).  Instead,

Appling called Haskins into her office, and Gray was fired.  (*Id.*).

While this incident alone does not demonstrate pretext, it contributes to the

bigger picture.  Only one of the disciplinary memoranda was signed by Gray; the others

were simply emailed to Human Resources to be placed in Gray's personnel file.  Gray

also testified that she thought Appling made up some of the memoranda because she

had never seen them before.  (Doc. 20 at 213:10-13, 214:16-18, 238:14-17).  Viewing

the evidence in the light most favorable to Gray, it supports her theory that Haskins was

creating a paper trail of disciplinary memoranda that would eventually support her

decision to fire Gray.  (Doc. 30 at 17).

Tri-County makes no arguments in its reply brief addressing these critical

allegations other than to complain that these allegations contradict the sworn testimony

of its witnesses and that it has not heard all of these facts before.  (Doc. 40 at 10-11).

Of course, contradictory testimony creates factual disputes.  Moreover, many of the

facts in the affidavit are not new.  Gray alleges that she reported preferential treatment

to Appling ten or twelve times.  (Doc. 30-1, ¶ 6).  This tracks with her interrogatory

response that she informed Appling of the "racially hostile work environment" and

Haskins's racist comments several times.  (Doc. 30-3 at 14).  Gray also alleges that

Appling would acknowledge complaints about preferential treatment, but she would

respond "that's just the way it is" or "you need to grow a thick skin."  (Doc. 30-1, ¶ 8).

Gray testified in her deposition that Appling told her she was not doing anything wrong

after one of her complaints and advised her to develop a thick skin after Gray reported

Haskins's use of the phrase "you people."  (Doc. 20 at 231:6-10, 237:21-22).   These

are not new allegations.[17]

In evaluating pretext, the Court asks "whether the plaintiff has cast sufficient

doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable

factfinder to conclude that the employee's proffered legitimate reasons were not what

actually motivated its conduct."  *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538

(11th Cir.1997) (citation and internal quotation marks omitted).  Gray has done so.

Summary judgment is **DENIED**.

### 4.  Retaliation

The *McDonnell Douglas* burden shifting framework is also used to analyze

retaliation claims under Title VII.  To establish a prima face case of retaliation, a plaintiff

must show that (1) she engaged in statutorily protected expression; (2) she suffered an

adverse employment action; and (3) the adverse action was causally related to the

protected expression.  *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227,

1233 (11th Cir. 2006).  If the plaintiff makes out a prima facie case of retaliation, the

burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for the

adverse employment action, and, if the employer does so, the plaintiff has the ultimate

burden of showing by a preponderance of the evidence that the employer's reasons

were pretextual.  *Holifield*, 115 F.3d at 1564-66.

An employee's speech regarding unfair employment practices is statutorily

protected speech if the employment practice is made unlawful by Title VII.  *See Clover*

---

[17] Gray makes an allegation that she requested a meeting of all CSRs in her declaration.  (Doc. 30-1, ¶ 12).  This might be a new fact, but Gray's evidence is sufficient to survive summary judgment even without this allegation.

*v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999).  Gray alleges that she engaged in statutorily protected expression when: (1) she reported Haskins's alleged "uppity niggers" comment to Appling; and (2) she complained to Appling on a "near weekly basis" about preferential treatment of Caucasian employees at Tri-County. (Doc. 30 at 10).

> **a. Prima facie case: Gray's report to Appling that she heard Haskins say she was tired of "putting up" with "uppity" African-Americans**

Tri-County argues that Gray's report of the alleged "uppity niggers" comment was not causally connected to Gray's discharge, so she cannot establish the third prong of the prima facie case for retaliation.  (Doc. 18-1 at 10).

A causal link between protected expression and adverse employment action can be established by showing that "the protected activity and the adverse action were not wholly unrelated."  *Clover*, 176 F.3d at 1354 (internal quotation marks and citation omitted).  A plaintiff can satisfy this element if she "provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  However, for temporal proximity alone to suffice to establish an inference of retaliation, "the temporal relationship between the protected activity and the adverse employment action must be 'very close.'  Even a three-month interval between the protected expression and the employment action ... is too long."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)); *see also Wallace v. Ga. Dep't of Transp.*, 212 F. App'x 799, 802 (11th Cir. 2006) ("[T]he Supreme Court has cited with approval decisions in which a three to four month

disparity was found to be insufficient to show causal connection."). The plaintiff must also prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Clark v. South Broward Hosp. Dist.*, 601 F. App'x 886, 897 (11th Cir. 2015).

Tri-County contends that the length of time between Gray's report of the alleged comment to Appling and the date of her termination is too attenuated to satisfy the causal connection prong of the prima facie case. (Doc. 18-1 at 10). Gray reported the alleged comment to Appling sometime in the summer of 2012, approximately six or seven months prior to her termination the following February. (Doc. 20 at 228:19-22). Gray agrees that three to four months between the protected activity and the adverse employment action is too long to satisfy the causal link prong without additional evidence. (Docs. 18-1 at 10; 30 at 12). Therefore, relying on temporal proximity alone, the six to seven months between Gray's report of the alleged comment and her termination is too attenuated for the causal link prong. *See Wallace*, 212 F. App'x at 802 ("In absence of additional evidence showing causation, [a] seven-month disparity [between the protected conduct and the adverse employment action] is insufficient to show the requisite causal connection needed to establish a *prima facie* case of retaliation.").

However, Gray contends that soon after she reported this incident, she began to be disciplined regularly, so she has "other evidence tending to show causation" and is not relying solely on temporal proximity between the protected activity and her termination. (Doc. 30 at 12, 12 n.4). She relies on *Crosby v. Mobile County Personnel Board*, 2007 WL 245126, at *4 (11th Cir.), to contend that receiving disciplinary

memoranda is an adverse employment action because these disciplinary memoranda "threatened that she may be terminated if she did not improve immediately." (Doc. 30 at 12).

Gray also argues that Appling's August 21, 2012 disciplinary memorandum is an adverse employment event that is sufficiently temporally connected to her report of Haskins's alleged comment in the summer of 2012. (Docs. 22 at 81; 30 at 15). The Court agrees.

The other disciplinary memoranda were issued on November 12, November 16, and December 17, and a performance appraisal was issued on December 28. Gray contends that all of these disciplinary actions, beginning with the August 21 memorandum, constitute "a single continuous act of retaliation" that occurred until her termination in February 2013. (Doc. 30 at 12). A chain of retaliatory treatment has been used to establish the causation requirement. *See, e.g., Pears v. Mobile Cty.*, 645 F. Supp. 2d 1062, 1096 (S.D. Ala. 2009) (finding a causal connection based on a sequence of events over a period of about seven months that included suspending the plaintiff without pay, giving him the only unfavorable performance evaluation in department history, reprimanding him in writing for an argument that someone else instigated, and firing him for failing a drug test, the results of which he had a valid explanation for). Gray has presented similar evidence of a chain of retaliatory conduct beginning in August 2012. Gray has also testified that Appling told her that neither the November 12 disciplinary memorandum nor the December 28 performance appraisal was warranted, but she had been directed to issue these documents to Gray. (Doc. 30-1, ¶¶ 16-19). This is sufficient for the prima facie case.

Tri-County contends that regardless of the time period between the protected activity and the termination, the intervening event of Gray's failure to follow procedure on January 31, 2013, when she set up an arrangement instead of a payment for a member, was a violation of policy that broke the causal chain.  (Doc. 40 at 10).  It relies on *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513 (11th Cir. 2007), in which an "intervening act of misconduct" between the time the employee made a complaint of suspected racial bias and the termination of her employment "severed the causal connection," resulting in the failure of the employee's prima facie case on causation grounds.  *Id.* at 520-21.  *Hankins*, however, is distinguishable.  In that case, the plaintiff was a probationary employee who complained that her supervisor was racially discriminating against her and reprimanding her both verbally and in writing for errors on the job.  *Id.* at 516-17.  Soon after submitting her complaint, the complaining employee had a confrontation with another employee during which she yelled at and threatened him.  *Id.* at 517.  This intervening act of misconduct broke any possible causal chain between her complaint of discrimination and her termination.  *Id.* at 520-21.  She was discharged because she did not successfully complete her probationary period and violated company rules by confronting her coworker, not because she reported discrimination by her supervisor.  *Id.* at 521.

Here, there is no such intervening act of misconduct, certainly not one that is a matter of undisputed fact.  Gray was not disciplined for an action clearly outside of her job description, such as confronting or threatening one of her colleagues.  Instead, Gray made an error in her work, apparently similar to errors she had made over the past several months which had resulted in discipline but not termination.  The Court finds no

authority to suggest that an error in job performance constitutes the type of "intervening cause" contemplated by the *Hankins c*ourt.  Therefore, Gray has established her prima facie case for the report of the alleged "uppity niggers" comment.

### b.  Prima facie case: regular reports of discrimination to Appling

Gray also contends that she regularly reported to Appling that she thought Haskins was discriminating on the basis of race.  (Doc. 30 at 10).  Although Appling disputes this version of events, contending that Gray's complaints were merely that Haskins was picking on her without mentioning race, Gray testified that she informed Appling on numerous occasions that Haskins discriminated against African-Americans. (Docs. 30-1, ¶ 6; 32 at 52:12).

Tri-County argues that Gray's allegation of regular complaints to Appling does not have the required specificity of content or dates to meet the causal link prong of the prima facie case.  (Doc. 40 at 9).  It asserts that Gray's only complaint with a specific date is that around August 9, 2011, Gray sent an email to Haskins and Appling complaining that Appling could only hear chatting by African-American CSRs.  (Docs. 20 at 152:20-153:1; 40 at 9).

Gray, however, does point to several specific complaints on specific dates within three months of her termination.  For instance, on November 12, 2012, she complained to Appling that she was being disciplined for errors made on an account when her Caucasian co-worker, Sauls, was not, even though Gray believed the errors should be attributed to the work Sauls did on the account.  (Doc. 20 at 166:1-4).  She also did not believe she was being treated fairly on December 28, 2012 when she received her year-end evaluation, and she wrote a rebuttal letter to this evaluation.  (Doc. 22 at 92).

While Gray does not specifically mention race in all of her complaints, she says it was obvious that this is what she meant.  (Doc. 30-1, ¶ 6).  The time between the last complaint, December 28, 2012, and the termination of Gray's employment, February 4, 2013, is just 38 days.  This is within the acceptable time period for the causal link.  *See Farley*, 197 F.3d at 1337 (holding that seven weeks was "sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case").  Gray has satisfied the prima facie case.

### c.  Legitimate, non-discriminatory reason and pretext

Once again, Tri-County has offered a legitimate, non-discriminatory reason for the adverse employment actions: poor job performance.

As discussed above, Gray has offered evidence that Appling told her that the November 12 disciplinary memorandum and the 2012 performance evaluation were pretextual when she gave them to Gray.  Again, Tri-County has not addressed this critical evidence.  There is a genuine dispute of material fact as to the issue of pretext. Summary judgment is **DENIED**.

### 5.  Hostile Work Environment

Out of an abundance of caution, likely based on the mention of a "racially hostile work environment" in the complaint (Doc. 1, ¶ 8), Tri-County has moved for summary judgment on any hostile work environment claims.  (Doc. 18-1 at 11-16).  Gray, however, does not have a claim for hostile work environment in her complaint, nor did she respond to this section of the motion for summary judgment in her response brief. (Docs. 1, 30).  Therefore, the Court concludes that Gray did not intend to assert a claim for hostile work environment.

### B.  Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, a plaintiff's

burden is "stringent."  She must demonstrate that:

> (1) the conduct giving rise to the claim was intentional or reckless;
> (2) the conduct was extreme and outrageous; (3) the conduct caused
> emotional distress; and (4) the emotional distress was severe.  The
> defendant's conduct must be so extreme in degree, as to go beyond all
> possible bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community.  Whether a claim rises to
> the requisite level of outrageousness and egregiousness to sustain a
> claim for intentional infliction of emotional distress is a question of law.

*Steed v. Fed. Nat. Mortg. Corp.*, 301 Ga. App. 801, 810, 689 S.E.2d 843, 851-52 (2009)

(citation omitted).  Tri-County asserts that the conduct was not extreme and outrageous,

and the distress was not sufficiently severe.  (Doc. 18-1 at 17).

### 1.  Extreme and outrageous conduct

Gray relies on *Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409

S.E.2d 835, 838 (1991), for her assertion that an act of deliberate retaliation is sufficient

for the extreme and outrageous conduct element.  (Doc. 30 at 20).  In *Yarbray*, the

plaintiff testified against her employer in another employee's discrimination suit against

the advice of the employer's attorney.  261 Ga. at 703-04, 409 S.E.2d at 836.  The

company retaliated by transferring the plaintiff to a less desirable position in which the

plaintiff was subjected to verbal abuse by her new supervisor.  *Id.* at 704, 409 S.E.2d at

836.  The Georgia Supreme Court held that this deliberate retaliation was extreme and

outrageous conduct sufficient to survive summary judgment.  *Id.* at 706, 409 S.E.2d at

838.

If she is telling the truth, Gray was the victim of a racist company officer who

forced Gray's African-American supervisor to manufacture evidence to oust Gray from

her job to make room for a white woman who wanted Gray's job and to rid the company of an "uppity" African-American.  Gray may not be telling the truth, but of course the Court cannot make that call.  On the record before it, the Court cannot say that Tri-County is entitled to judgment as a matter of law.

### 2.  Severity of the emotional distress

Gray has presented evidence that her emotional distress resulted in weight gain, loss of sleep, and reduced levels of trust in her interactions with other people.  (Doc. 30-3 at 13).  While her allegations may be weak, on the current record it stands unrebutted.  She was not examined in her deposition about these allegations, and, without evidence to the contrary, the Court cannot say as a matter of law that her emotional distress was not severe.

Summary judgment is **DENIED**.

### C.  Negligent Retention and Supervision[18]

In order to sustain a claim for negligent retention and supervision, Gray must show that Tri-County knew or should have known of Haskins's propensity to discriminate against and harass employees and that it was foreseeable that Haskins would engage in such misconduct.  *See Cox v. Brazo,* 165 Ga. App. 888, 889, 303 S.E.2d 71, 73 (1983).

Tri-County asserts that Gray's negligent retention and supervision claim must fail because Tri-County's CEO, Bentley, has not received any complaints of race discrimination by Haskins.  (Doc. 18-1 at 20).  Gray admits that Bentley did not know about these complaints, but she contends that Appling's knowledge can be imputed to

---

[18] The utility of this claim is not apparent to the Court.  Tri-County has not taken the position that it is not vicariously liable for its employees' alleged misconduct.

Tri-County.  (Docs. 30 at 21; 30-4, ¶ 237).  However, Appling's knowledge is not enough because she is not Haskins's employer or supervisor.  Appling is not even a member of Tri-County's "senior staff."  (Docs. 24 at 21:11-12; 32 at 39:4, 55:14-16).  Therefore, her knowledge of any mistreatment of Tri-County employees by Haskins is not sufficient to sustain a claim for negligent retention and supervision against Tri-County; she is not the person retaining or supervising Haskins at Tri-County.  Therefore, summary judgment is **GRANTED**.

## III.  CONCLUSION

Based on the foregoing, Tri-County's Motion for Summary Judgment is **GRANTED in part and DENIED in part**.  (Doc. 18).

**SO ORDERED**, this 25th day of March, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT